**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

NATIONAL ENTERPRISES, INC.,

      Plaintiff,

      vs.                                          No. CIV 94-1012  JC/RLP

FIRST WESTERN FINANCIAL
CORPORATION, a New Mexico Corporation,
HOWARD T. VAN PELT, GUY MERRELL,
and JAMES E. HAWORTH,

      Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS MATTER came before the Court for a bench trial on May 11, 1998, the Honorable John E. Conway, Chief United States District Judge, presiding.  The Court has considered the witnesses and exhibits presented at trial, as well as the arguments advanced by both parties.  For the reasons set forth on the record at trial and based on the following findings and conclusions, I find in favor of Defendants and dismiss Plaintiff's complaint.

**Findings of Fact**

1.      This Court has jurisdiction over the subject matter and the parties to this action.

2.      The subject matter of this action is a suit on a promissory note under which First Western Financial Corporation ("First Western") was the maker and Defendants Howard T. Van Pelt and James E. Haworth were guarantors.

3. In 1985, First Western negotiated an $8.9 million loan from Sandia Federal Savings and Loan Association ("Sandia") for construction of an apartment and day care facility in El Paso, Texas. The project was called the Las Lomas Joint Venture ("Las Lomas").

4. As part of the closing documents evidencing and securing the loan, Las Lomas executed and delivered to Sandia a Deed of Trust encumbering the entire project.

5. The Deed of Trust secured not only the loan, but also "all other direct and indirect indebtedness now or at any time in the future owing or to be owing by Grantor [Las Lomas Joint Venture] to Beneficiaries [Sandia], regardless of how evidenced or incurred, it being understood that it is contemplated that Grantor [Las Lomas Joint Venture] will become further indebted to Beneficiaries [Sandia] in the future."

6. Sandia originally was a partner in the joint venture, but had to back out of the agreement.

7. The parties contemplated additional loans to cover anticipated cash shortfalls on the Las Lomas project after Sandia withdrew as partner.

8. In order to cover cash shortages resulting from Sandia's withdrawal from the joint venture, First Western borrowed an additional $100,000 for Las Lomas from Sandia.

9. In 1988, First Western defaulted on the $8.9 million loan and the $100,000 note.

10. In 1989, Sandia was placed into receivership by the Resolution Trust Corporation ("RTC").

11. In 1990, Las Lomas/First Western sued Sandia for failing to perform their portion of the partnership agreement which allegedly resulted in Las Lomas/First Western being forced to take out additional loans.

12.     Negotiations with the RTC, through Nevander Asset Management, Inc., continued through July 6, 1992, at which time the RTC and First Western (and the individual defendants) entered into a "Compromise and Settlement Agreement" prepared by attorneys for the RTC.

13.     The RTC released First Western from "any and all claims, demands, obligations and causes of action of any nature whatsoever relating to or in any way arising out of the Note and Loan Documents" in exchange for a "friendly foreclosure . . . and other consideration."

14.     Mr. Sporing, as a Sandia loan officer and agent for the RTC, knew the $100,000 was meant to cover cash shortfalls on the Las Lomas project and was related to the $8.9 million loan.

15.     The settlement proposal memorandum signed by Mr. Sporing, written to the Managing Agent, and included in the loan files for Las Lomas Joint Venture, linked the $8.9 million loan with the "related asset" of First Western Financial in the amount of $98,950--the same loan at issue in this case.

16.     In 1994, National Enterprises, Inc., filed suit against Defendants on the $100,000 note, claiming they had bought the note from the RTC.

17.     I find Defendants' version of the circumstances surrounding the execution of the Compromise and Settlement agreement credible.

18.     The parties intended to release the $100,000 note along with the $8.9 million loan:

a)  During negotiations with First Western, Mr. Sporing, as an agent of the RTC, was aware that the $100,000 was to be included in the settlement.

b)  In October, 1990, during a negotiation meeting, an RTC representative included the $100,000 note on the board as part of the list of indebtedness the parties were trying to settle.

   c) In a September 24, 1991, letter to the RTC, attorney for Defendants summarized the proposal for settlement discussed in the meeting, including language which put the RTC on notice that Defendants wished to settle all indebtedness of all parties: "Las Lomas and the RTC will enter into Mutual Releases as to all claims and indebtedness of each to the other, known and unknown."

   d) The March 19, 1992, letter from Nevander Asset Management, Inc., an RTC agent, to attorney for Defendants, indicated the "RTC authorized the release of the maker and guarantors from all indebtedness in this transaction."

  19. I do not find it reasonable to believe a party would litigate for two years and settle the $8.9 million loan without also settling the $100,000 note--the only remaining indebtedness to Sandia and the RTC.

  20. NEI purchased a note from the RTC that already had been extinguished by the July 6, 1992 Compromise and Settlement Agreement.

### Conclusions of Law

  1. This Court has jurisdiction over the subject matter and the parties to this action.

  2. The <u>D'Oench-Dume</u> doctrine does not apply to the only issue remaining in this action--whether the release in the Compromise and Settlement Agreement included the $100,000 note.

  3. Texas law applies to the scope of the release contained in the settlement agreement.

  4. As a matter of law, the Compromise and Settlement Agreement is ambiguous as to whether the $100,000 note was to be released along with the $8.9 million loan.

  5. The $100,000 loan was a loan contemplated by Sandia and First Western at the time of signing the Deed of Trust and that loan was secured by the Deed of Trust.

6. The negotiations between First Western and the RTC, beginning in 1989 and continuing through July of 1992, culminated in a contractual and enforceable Compromise and Settlement Agreement, effective July 6, 1992.

7. Valid consideration was given by each of the parties to the others with respect to the Compromise and Settlement Agreement, including the dismissal of the suit by Las Lomas Joint Venture against the RTC.

8. The parties intended to and did include, as part of the Compromise and Settlement Agreement, a release by the RTC of the $100,000 note as well as the $8.9 million loan.

Wherefore,

IT IS ORDERED that Plaintiff's complaint is dismissed in its entirety against all Defendants.

IT IS FURTHER ORDERED that Defendants recover their costs.

DATED this 28th day of May, 1998.

_____
CHIEF UNITED STATES DISTRICT JUDGE

Counsel for Plaintiff:         William C. Salmon
                               Rhodes & Salmon, P. C.
                               Albuquerque, New Mexico

Counsel for Defendants:        William J. Cooksey
                               George A. Dubois
                               Dubois, Cooksey & Bischoff, P. A.
                               Albuquerque, New Mexico